**BOYER v. ANDERSON et ux.**

No. 10466.

United States Court of Appeals Seventh Circuit.

Jan. 30, 1952.

Rehearing Denied March 19, 1952.

Albert Stump, Byron Emswiller, Indianapolis, Ind., for appellants.

George R. Jeffrey, George B. Jeffrey, Indianapolis, Ind., Waldo C. Ging, Greenfield, Ind., for appellee.

Before KERNER, DUFFY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The plaintiff, Joseph C. Boyer, brought an action on a promissory note and to foreclose the mortgage securing it, against the defendants Walter M. Anderson and Margaret Anderson, his wife. The promissory note, executed only by Walter M. Anderson, was given to Boyer as evidence of the unpaid balance on the purchase price of a concrete block manufacturing plant which Anderson bought from Boyer. The mortgage covered both the real and personal property described therein. Both defendants executed the mortgage which, after setting out a copy of the note, contained a promise that the mortgagors would pay "the sum of money above secured." The note, in the principal amount of $21,650.00, was payable in three equal instalments, the first being due July 1, 1949. The first instalment was not paid when due and the plaintiff exercised his option to declare the entire debt due and to foreclose the mortgage.

The answer and counterclaim filed by the defendants alleged failure by the plaintiff to perform his part of the contract of sale in that he failed to deliver part of the property sold, and that the plaintiff was guilty of fraud in inducing the defendant Anderson to purchase the property. The answer and counterclaim of defendants prayed that "the defendants be given a set-off and counter-claim on the said note and mortgage in the sum of $6,580.95, together with such additional amounts for rent as may accrue until this cause is finally determined, together with a reduction of interest on the amount of the counter-claim from the original amount due on the note and mortgage, and attorneys' fees such as the Court may determine, and judgment in favor of the defendants that the said note and mortgage is not in default," and a judgment "for damages against the plaintiff in such amount as the Court may find for the loss of the use of the said equipment occasioned by the fraudulent representations of the plaintiff * * *."

The Court found against the defendants both on the complaint and the counterclaim and entered a judgment ordering the mort-

gage foreclosed, the mortgaged property sold, and giving the plaintiff a personal money judgment against both defendants for any deficiency.

Defendants' first contention is that no deficiency judgment should have been entered against the defendant Margaret Anderson since she did not sign the promissory note and signed the mortgage only for the purpose of making it possible to free the mortgaged property from her inchoate dower interest in the event of the foreclosure of the mortgage. They also say that her promise, in the mortgage, to pay the debt secured by the mortgage could not be enforced against her because there was no consideration for this promise.

Defendants apparently concede, as indeed they must under Indiana authorities, that the promise of Mrs. Anderson to pay the debt secured by the mortgage, although only in the mortgage, would constitute a valid and enforceable obligation to pay if there were consideration for such promise.

In Noble County Bank v. Waterhouse, 89 Ind.App. 94, 163 N.E. 119, a husband borrowed money and gave his note promising to pay. He and his wife both executed a mortgage securing the payment of the note, which mortgage contained an express agreement to pay the amount of debt secured by the mortgage. The wife there also contended that she had merely executed the mortgage for the purpose of releasing her inchoate interest in the real estate. The court there said, at page 98 of 89 Ind.App., at page 120 of 163 N.E.: "That a joint promise to pay the mortgage debt is just as valid and binding, though found only in the mortgage itself, as it would have been, had it been expressed in the note to secure which the mortgage was given, is well settled by Indiana authorities. (Citing Indiana decisions.) And appellee could not be heard to say, in view of such express written joint promise to pay the debt secured, that she did not become liable therefor, except that, as the wife of Waterhouse, she executed the mortgages for the purpose only of releasing her inchoate interest in the real estate mortgaged for the debt of her husband. The written promise

is unambiguous and absolute, and cannot be contradicted or modified by parol evidence of intention."

In Stamper v. Link, 117 Ind.App. 212, at page 219, 66 N.E.2d 326, 69 N.E.2d 600, 602, 71 N.E.2d 128, the court said: "It is the general rule, except where statutes provide otherwise, that if the mortgage contains a covenant to pay the debt secured, the mortgagor is personally liable and an action in debt will lie on the covenant."

An Indiana statute on the construction of mortgages recognizes promises to pay contained in mortgages as being equally as binding as such promises contained in the note or bond secured by the mortgage. This statute, § 56–702, Burns' Indiana Statutes, Annotated, (1951 Replacement) says that mortgages shall not be construed as *implying* a covenant for the payment of the sum secured and that "where there is no express covenant contained in the mortgage for such payment, and no bond or other separate instrument to secure such payment shall have been given, the remedies of the mortgagee shall be confined to the lands mentioned in the mortgage."

Section 3–1814, Burns' Indiana Statutes, Annotated, (1946 Replacement) provides that in rendering judgment of foreclosure the court shall give personal judgment against any party to the suit " * * * liable upon any agreement or agreements for the payment of any sum or sums of money secured by the mortgage * * *."

In discussing the Noble County Bank case, supra, the defendants, in their reply brief, indicate agreement with the decision, saying: "There would be consideration from the bank to the wife where the wife wanted the husband to obtain the credit, and in order to have the credit extended she signed a mortgage which induced the extending of the credit."

The defendants admit that the extension of credit to a husband may constitute sufficient consideration to support a wife's promise in the mortgage to pay the mortgage debt. The defendants attempt to distinguish the Noble County Bank case by saying that there it is not shown that the

credit was extended to the husband prior to the execution of the mortgage promise of the wife to pay.

The question as to consideration to Mrs. Anderson for her execution of the mortgage was not raised by the defendants in any pleading filed in the trial court. Evidence as to the exact time of the delivery of the various documents involved was not clear. Anderson, himself, testified that: "I paid the first payment of $1,000.00 as a binder on June 12 and the remaining $3,000.00 the day I got the deed, which was about August 2nd. The note is dated July 30th. The mortgage August 2nd, both in 1948. Just my signature is on the note. Mrs. Anderson wasn't with me. She signed the mortgage in the office of Mr. Ging. We signed the note in Greenfield on July 30th, and then took the mortgage back to Cincinnati. Then I was given the deed and bill of sale."

This testimony would seem to indicate that Anderson did not receive the deed and bill of sale until after he had delivered the mortgage. At that time it is clear that Anderson attached no significance to the fact that his wife did not sign the note. After saying that only his signature was on the note, he said in apparent explanation of the fact that his wife didn't sign it, "Mrs. Anderson wasn't with me." In their answer and cross-complaint the defendants placed the final closing date of the entire transaction as "on or about August 10, 1948." It would seem that the only reasonable inference to be drawn from the evidence and pleadings was that the mortgage had been executed by both the husband and the wife prior to the delivery of the deed and bill of sale to Anderson and that the mortgage was given to Boyer at the time of the delivery of the deed and bill of sale.

In this case, however, the actual sequence of the delivery of these documents is not important. Here the contract of purchase and sale clearly contemplated only one transaction and that one transaction, by the express terms of the contract, included the giving of a "real and chattel mortgage" to secure the unpaid balance of the purchase price. Without the mortgage Anderson would not have received credit for the unpaid balance. The extension of credit to him was sufficient consideration for the promise of Mrs. Anderson to pay.

The defendants' chief contentions, as set forth in their answer and counterclaim, are failure of consideration, charging that the plaintiff failed to deliver all of the property covered by the contract of purchase, and fraud on the part of the plaintiff, in that he is alleged to have misrepresented the condition of the machinery and equipment of the plant.

The alleged failure of consideration which was charged in the counterclaim was found against the defendants on conflicting evidence. The evidence indicates that Anderson, on several occasions before he bought the plant, visited the plant for inspection and that on at least one occasion he was accompanied by Armond Neihaus, District Manager for Besser Manufacturing Company, a manufacturer of machinery for making concrete blocks. Neihaus had had enough experience in the sales and service departments of his company to be considered an expert. He said that he went to the plant at the direction of Anderson "to check over the items, to see what shape they were in and things like that—the machinery." At the time of his first visit Neihaus failed to inspect the machinery and equipment thoroughly because of the confusion and state of disorder in which he found the plant. Thereafter, in August 1948, Anderson hired Lorance Sterns to get the plant in order and operate it. Together Anderson and Sterns cleaned the concrete off of the machinery and put the place in order. They planned to improve and modernize the plant to some extent. Pursuant to this plan, Sterns discarded some of the tools and equipment he found in the plant which he considered should be replaced and made a list of the equipment needed to put the plant in the condition necessary for their plan for operation. Several months later Neihaus made a second visit to the plant and checked the equipment he found there against the list that Sterns had made. Neither Sterns nor Neihaus knew whether the items then listed as missing or needed were included

in the property sold by Boyer to Anderson or whether such items had been present in the plant and had been discarded by Sterns as not meeting the higher standards desired by Anderson and Sterns.

Boyer and Anderson disagree as to just what property the contract of purchase covered. While the parties were negotiating they jointly employed an appraisal firm, Barker & Son of Indianapolis, to make an inventory and appraisal of the plant and its equipment. The appraisal was made on May 11 and May 12, 1948. The original of this typewritten appraisal shows the items appraised numbered consecutively with a pencil. The contract of purchase recites that it covers "all of the items of personal property or fixtures listed on the attached sheets which are made a part of the original copy of this contract, and copies of which are to be subsequently attached to the copies of the contract." A sheet, purportedly describing the property and fixtures, which was attached to the copy of the contract that was made an exhibit and introduced into evidence stated that it was a "list of property to be purchased by Walter Anderson from J. C. Boyer, being item numbers from the appraisal made by Barker & Son." Then followed a list of the penciled item numbers of the Barker & Son appraisal. The numbered items of the appraisal, however, were rather indefinite in the description of the property described in the various items—so indefinite that it is easy to understand how an honest misunderstanding might have arisen between the parties as to the exact property covered. The parties, for instance, vigorously disagreed on the question of the number of parts that should be considered necessary to constitute "one set of cement block molds" for a Besser K–3 type for a specified size of blocks. Anderson now contends that this description required Boyer to have and deliver all of the accessories and parts listed in the Besser company's catalogue as accessories to and parts of such a set, regardless of whether all parts listed in the catalogue were necessary or were normally carried in a plant such as this. The bill of sale given by Boyer to Anderson used the same

item numbers which were used in the Barker & Son appraisal together with the appraisal description of the property covered by the numbers.

It is admitted that Anderson bought from Boyer only a portion of the equipment which Boyer owned and which was located in the plant. Anderson explained that he did not buy part of the equipment and tools from Boyer because he could purchase them for less from someone else and also because he (Anderson) did not consider some of the tools and equipment owned by Boyer to be in such condition as to be usable for his purposes.

There was sufficient evidence from which the District Court could find that there were on hand, and delivered to Anderson, sufficient parts and accessories to manufacture cement blocks of the various sizes specified. Since this contention as to the delivery of the property purchased involved a question of fact, the solution of which depended primarily upon the conflicting evidence of Boyer and Anderson, and since the District Court decided the question against the defendants, it is not within our power to set aside that decision.

On the question of the plaintiff's fraud, the defendants contend that, in order to induce Anderson to purchase the property, Boyer falsely represented that the machinery and equipment in the plant was usable and that it could be put in operation within one or two days. Boyer had quit operating this plant in 1947. The plant was still idle at the time Anderson bought it in August 1948. It is not disputed that when Boyer shut down the plant he failed to have the machinery properly cleaned and put in order, but this was apparent to Anderson each time he inspected the plant.

Don Thomas testified that he worked for Boyer as superintendent of the plant from June to October 1947, and that at the time they closed the plant down there were parts in the machines and spare parts sufficient to operate the plant and make the blocks their customers demanded.

Barker & Son's written inventory and appraisal also recited that "as appraisers of the above this property was inspected

by the undersigned under date of 5/11/48 and 5/12/48 and found to be in good usable condition."

Armond Neihaus testified that when he inspected the plant in the Summer of 1948 the plant could have been operated to make eight inch blocks. He also said that the plant could not be operated without a lifting truck, pallets and racks. These were items which Anderson did not buy from Boyer or from anyone else.

Boyer testified that he operated the plant from 1942 to October 1947; that during that time the plant was in fairly good condition as to operability; and that he showed the plant to Anderson and answered Anderson's questions and explained to him about the various tools and equipment. Boyer insisted that while he was operating the plant they manufactured "good blocks" and that they had a good demand for the blocks from contractors and farmers.

Lorance Sterns testified that he worked for Anderson for about eight weeks beginning in August 1948. He said that at the time he went to work for Anderson there was sufficient equipment in the plant so that anyone familiar with the cement block manufacturing business could have started operation and manufactured cement blocks of various types and sizes and that at that time the equipment was usable. He said that Boyer could have put the plant back in operation and made blocks within one or two days with experienced help and "there is no doubt about it." Sterns said he tested the block machine mixer and conveyor and found that they could be operated. As to a starter switch about which Anderson complained, Sterns explained that he repaired it with a screw driver and a pair of pliers in a few minutes—that it was a minor detail. He also testified that during the eight weeks he worked for Anderson he came and went without interference from Boyer, and that he had a key to the plant which he turned over to Anderson when he left.

It appears that the first complaint of any kind made by Anderson was through his attorney to Boyer on October 31, 1948. At that time, however, Anderson was only

complaining of certain equipment which he claimed that Boyer had removed from the plant after he (Anderson) had purchased it. Boyer insists that there was no complaint as to any misrepresentations from Anderson until the first payment on his note became due a year after the purchase had been completed.

Here again, on the question of fraud, we find testimony more than sufficient to sustain the District Court's finding that "On and prior to the date of sale of the items described in the complaint, to the defendant, Walter M. Anderson, all of the property and equipment necessary to operate said plant and to manufacture concrete blocks was on the premises," and "That the preponderance of the evidence does not support the answer and counterclaim of the defendants and said counterclaim should be denied."

The judgment of the District Court is affirmed.